Morning, counsel. Morning, Your Honors. May it please the Court, Denise Placencia on behalf of Appellant Viad Corporation. The question presented before you. Let me just say I mentioned earlier we're going to stick to the time limits. I didn't mention what we sometimes explain that cases are allotted time on the basis of some mysterious formula that often does not appear to make a lot of sense. So don't feel compelled to use 20 minutes for this case. It doesn't present the most complex legal issues. I would agree, Your Honor, and thank you. May I start over? Yes, please. Your Honors, my name is Denise Placencia and I represent Appellant Viad Corporation in this matter. The question presented before you is whether Viad was notified in writing of Bosa's environmental obligation before March 1, 1992. GLI and the District Court assert that there is no difference between actual and imputed notice when it comes to the terms of the settlement agreement. The intentions of the parties in devising a drop-dead date by which Viad would no longer be responsible for environmental obligations must be honored. Well, there is some evidence, isn't there, that there were written memos going back to 1987 which indicated the problem? Your Honors, those memos, in order for the Court to get to those memos, they have to allow Bosa's claim to not stand by itself in the continuum of time. It has to allow Bosa's claim to relate back or to bootstrap back to prior instances. The language of the settlement agreement specifically says that GLI shall be responsible for and perform all environmental obligations with respect to the properties except for those that Viad was notified about prior to March 1. That paragraph makes clear that if Viad was notified before March 1, the settlement agreement does not apply in other documents' control, and if Viad was notified after March 1, the settlement agreement does apply. What's crucial in Your Honors' question is understanding that unlike the prior agreements between the parties, there is no language in the settlement agreement which allows for an environmental obligation to arise out of, be related to, or connected with a prior obligation. Those ten words are in all of the prior agreements between the parties. It is not within the terms of the settlement agreement. This broader coverage language was divested in the settlement agreement so that the timeline or the drop-dead date would have meaning for the parties. If that language was included within the agreement of the parties, there could never be an instance that Viad was notified of an environmental obligation after the effective date because it could always be hinged as arising out of something else. They had to divest that language so that the date had meaning. The district court's opinion and GLI's argument makes sense if Section 2.4 of the settlement agreement were to state, which it doesn't, but if it did, state that GLI shall be liable and perform environmental obligations with respect to all of the properties except those arising out of or related to or in connection with prior environmental obligations that Viad was notified of. The settlement agreement does not state that. This is why Viad, the appellant, repeatedly argued at the trial court level that the BOSA claim cannot be related back or bootstrapped to the prior notices because the settlement agreement does not contain that broader coverage language, unlike the prior agreements between the parties. And there would, under this interpretation, never be an instance where Viad was relieved of its indemnity obligations. The district court's interpretation and GLI's argument effectively inserts those ten words into the settlement agreement. Kennedy. Excuse me. Could you just tell me what paragraphs of the settlement agreement you're talking about? Yes, Your Honor. Section 2.4. 2.4. Thank you. I'm looking at 2.4, and I'm thinking that it's really very broadly worded. You're suggesting there is to be given a much more narrow interpretation.  Because it does say notified, it shall be considered notified if there's the existence or nature of the environmental obligation has been reasonably disclosed in writing. Well, arguably, anything that's in the files would meet that obligation. Your Honor, that is not true because the parties divested themselves of the arising out of language. If that language was there, then Your Honor's argument would be correct. The documents that GLI and the district court relied on, which were various letters and cleanup and abatement orders, requires this Court not to hold the BOSA claim in time. It requires this Court to relate it back to, which there is no provision for in the settlement agreement, unlike the other agreements. What is it you have to be notified of in your view? In my opinion, for VIA to have been notified, it would have to have been put on notice that there was a claim by BOSA on the BOSA property for damages. That's not the definition of environmental obligation. It says you have to be notified about an environmental obligation. Then you look at the definition of environmental obligation. It doesn't say anything about a claim. It talks about an obligation under a statute, a regulation, anything. All you have to know is that you have a duty to clean that up or that you've started remediating it, either one, without knowing that anybody will ever make a claim. That is true. That is what the environmental obligation definitional section says. However, VIAD, although VIAD was notified with problems as to its own property, the nature and extent of those problems were not disclosed to carry over onto the BOSA property. And if you were to read the document in that fashion, the marginal ---- Well, that's different from saying that there had to be a claim by BOSA. Now you're saying they had to be aware that there was a problem on the BOSA property. What I'm saying is that the district court said that even though you received notices in 1988, in 1999, we're going to hold you responsible even though the BOSA property and parcel is not identified, and even though BOSA didn't even own the property until 1998. Okay, can I make this a little more specific just so I understand where it's going? In a report, final report of May 1987, if you're familiar with that, there's a map attached to it at ER 621. Your Honor, may I have a moment to grab that? If you have it, sure. Yes, I do. Your Honor, I'm sorry. Did you say ER 621? Yes. The map that says the product thickness contour map. So I think it's the last page of that report, of the final report of the consultant's report. Yes, Your Honor. I have that map. Okay. Now, there's the ice house is shown on the left side by Martin Luther King Way and between Island Avenue. Yes, Your Honor, it is. Okay, that's the BOSA property, right? That is the property that became the BOSA property, yes. Now, if I look at that dotted line, the legend says that's estimated boundary of contaminated soil, which extends into that property. That is what the map says, yes, Your Honor. Okay. Now, that indicates that there's a problem on that property. Whoever may own it, there's a problem, if not extent, at least potential on that property. Potentially, yes. Why isn't that notice? Because one cannot be notified of a potentiality to be held to it. The second thing is that that map and the letter to that map is not a writing from GLI or a state or federal environmental regulatory agency to VAD. That map was prepared by a consultant for the Center City Development Corporation and, therefore, is not a writing as defined in section in the settlement agreement. That is why that map does not meet the standard. The notice requirements were exacting. It had to come from a certain entity at a certain point in time. I submit to the Court that, hypothetically speaking, if the language contained within the four corners of the March settlement agreement allowed for any person to give notice or any writing to give notice, perhaps there would be a different argument made before the Court. But the document does not allow for that. Therefore the ---- You say, if I understand your position, if Greyhound Lines, I guess it is, if they sent it to you, they sent you a letter that said, this property is affected, and they signed it, that would be all right. But if they sent you a letter that attached a report that showed it, that would not be in writing, right? In your example, Your Honor, the writing from Greyhound to VAD would have to say that this property is affected and we are putting you on notice that we are holding you responsible for that affectation. In the writing, the example that you gave does not state that. Are we looking for some magic words, then? Is that what you're saying? No, Your Honor. We're not looking for some magic words. We are asking that the Court uphold the intention of the parties that a drop-dead date be established and be honored so that there was a time when VAD could establish its liability. In other words, this map might have been compliance if it were sent within this latter period. That's correct, Your Honor. Or even referred back to it, maybe? That's correct, Your Honor. And that never happened? That never happened. The map wasn't sent in time, you say? That was not sent pursuant to the terms of the written settlement agreement between the parties. It is not in writing. Okay. Those are different points. But I just thought I heard your discussion with Judge O'Scanlan relating to time, that it was a problem of not saying it related back because it wasn't sent at the right time? I'm saying that you have to allow the Bosa claim to relate back to those prior notices for it to be a valid effectual notice. The only question remains, then, is the Bosa claim one which arose after March 1, 1992? I think we can all agree it didn't. Bosa filed his claim, a letter claimed by March 19, 1999, to Greyhound and to GLI and the parties settled that Bosa claim with Greyhound and V.E.A.D. each denying liability for the claim and stipulating that there had been no assessment, testing, or remediation of the Bosa property. That stipulation by itself precludes a finding by the district court that V.E.A.D. was put on notice under Section 2.4B of the settlement agreement, which refers to side assessment, testing, or remediation. The only question that's left is, is there a writing from GLI or a ---- Where is the stipulation that says that no remediation of any kind has been done on the property? That would be on ER page 499, Your Honor. And what does it say? Your Honor, may I? Yes. In the settlement agreement with Bosa, the parties stipulated in Recital E on page 499 of the record, V.E.A.D. and Greyhound agree that there has been no assessment, testing, or remediation of the property by any of the defendants. By that stipulation, notice has not been given under Section 2.4B. Your Honor, I would like to reserve the 5 minutes remaining of my time for rebuttal. Certainly, counsel. Counsel. Good morning, Your Honors. May it please the Court, my name is Suzanne Varco. I'm here on behalf of Greyhound Lines, Inc., the Respondent in this action. I'll address a few of your concerns that you raised with Appellant's counsel moments ago. First off, I'll take your attention back to the maps that you were discussing at ER 621. And that map is actually part of a report that's called a final report prepared by Applied Hydrogeologic Consultants dated May 1987. If you look at ER 596, you'll see a letter dated May 28th, 1987, from W.J. Hallinan, who's at the Greyhound Corporation, to J.A. McComb. You'll note Ken Rees' name, who was at that time part of the Greyhound Corporation, is now with the Viad Corporation. And you'll note his declaration was submitted in the record and as part of the motion for summary judgment to the trial court, referencing that Mr. Rees, in fact, received this letter, which attaches this report showing the contamination not only stretching from the Greyhound property, but emanating off of that property and onto the former ghosted property, then the Ice House property. But our counsel argues that that all happened back in 1987. It doesn't – it's – it does not qualify within the meaning of the new agreement. Well, what counsel wants you to believe is that these are two separate things that are happening. What – the chronology of events here isn't one event of contamination back in 1987 and a new event of contamination in 1999. In fact, in 1999, the remediation of the Greyhound site was still ongoing. The clean-up and abatement order that had been issued by the regional board back in 1989 was still in effect. The parties were still doing remediation and monitoring, not only on the Greyhound site, but on that entire six-block area that's referred to in the clean-up and abatement order. This was not something new that suddenly surprised everyone, because suddenly Bosa says, oh, wow, we have contamination on our site. This is something that everybody, not just Viad, not just Greyhound, but the other parties to that clean-up and abatement order, knew where this plume was, knew where these contaminants were, knew the potential of future liability relating to the contamination and the migration of the contamination. So while Appellant's counsel wants to separate this out as two distinct events that occurred at separate points in time, that's not the reality of the situation. And the San Diego letter agreement is specific as to that. You'll note that every other agreement that GLI entered into with Viad encompassed several properties. This San Diego property was very important to allocate the liability, because at the time that Greyhound bought this from Viad, they knew there was existing contamination there. They knew that it related to Viad's former use of the site, because it was the contamination that had been found was diesel number one, which Viad had used up until 1974 and had never been used by Greyhound or Viad after that date. So they knew the source of the contamination. They knew it existed. And they knew that they wanted to allocate liability on the site. Consequently, unlike any other site that we have, this one had the specific San Diego letter agreement, which says, Viad, you're on the hook for this. And you're not only on the hook for the remediation, but you're on the hook for third-party claims. And it specifies that in the San Diego letter agreement. Now, relate this all to section 2.4, which is a – which I guess is the crucial provision here. Is that – 2.4, the settlement agreement? Yes, Your Honor. It is the crucial condition. And as we've argued in our brief, we've satisfied that condition in all three ways. It requires that Viad be notified prior to March 1, 1992, of this environmental obligation. And the environmental obligation includes not only the contamination on the Viad property or the Greyhound property, but anything that migrates off of that property. And that's specifically included in the definition. It was contemplated by the parties that this stuff doesn't stop at your boundaries. It migrates to other places. And consequently, the settlement agreement contemplated that not only will an environmental obligation mean what's sitting here on our site, but it means anything that goes somewhere from our site. So the question is, did Viad get notification under any one of those three opportunities that are listed in 2.4 before March 1, 1992? And the answer to that is yes to all three. Did GLI tell Viad that there was a problem? Absolutely. There were letters and memos between GLI and Viad saying, here, we've got to clean up an abatement order. The clean-up and abatement order was an original issue to GLI. GLI sent it to Viad and said, hey, look here, we've got to clean up an abatement order. We think this is your problem. In response to that, in direct response to that, Viad writes a letter to the regional board and says, hey, we're the former owners. We're on the hook. Send all your future correspondence to us. And in response, the regional board amends the clean-up order to name TLC now Viad. If that's not noticed, I don't know what qualifies. That's before March. That's before March 1992. That's back in 1991. And that's with respect to the ice house. Correct. That's with respect to the six-block area. The whole area. For contamination. Exactly. The clean-up and abatement order is very specific as to, if you look at order 9145. But it does specifically affect this property. It specifically affects this property. The six-block area is specifically referenced. And the clean-up and abatement order doesn't say clean up your property, Viad. So just so I understand, then, what you're saying is that Viad was on notice for that, it sounds like. Exactly. And that. Hold on a second. I apologize. I don't know whether that's exact or not, because I haven't finished my question. That any contamination within the six-block, it already had notice of it. So if that's the case, what's the purpose of 2.4 at all? It seems to me they've. . . Why didn't they just stipulate they had notice? So what's the purpose of saying they need more notice? Or do you have to go to proof of any notice? With respect to the. . . if I may. Yeah. With respect to the settlement agreement, it covered not only the San Diego site. It covered several other sites. So the notice provision is in there to address not specific to San Diego but other sites and making sure they get appropriate notice on those sites as well. But one of the requirements in the notice provision, or one of the options for notice, is that Viad get noticed by a regulatory agency. And, in fact, the clean-up and abatement orders, which were issued by the Regional Water Quality Control Board, which is an agency which satisfies this condition, were addressed to Viad. They were named in the order. The order specifically said this plume is a six-block aerial extent plume. The order specifically said each party that's named in this order, including Viad, is required to find out the vertical and lateral extent of their contamination and do something about it. Well, again, that's my. . . if you look at that map, for example, and I don't have in mind which one you're referring to, but if I look at the map that we've been talking about, it doesn't show in the six-block area every parcel of property being affected by the plume, does it? It does happen to intersect with the ice house, but is every structure within there affected? Every parcel? I'm not sure I understand. Well, you're saying the obligation is to go out. . . You say, first I understood you say the clean-up and abatement order identified every parcel as being affected, so as being contaminated. Then what you just said seemed to suggest is potentially affected, and you need to go out and find out, you have an obligation to find out which are affected. So they aren't yet on notice, then, that a specific parcel is. They may be on notice that there's a risk. From the chronology, Center City Development Corporation was starting a project in this area, and that sort of was the defining moment. They started doing sampling in this area, and they said, wow, there's a problem here. This map in 1987 was produced as a result of CCDC's investigation using applied hydrogeologic consultants. As a result of this investigation, in 1989, the regional board issued a clean-up and abatement order. They said, okay, let's look at the data that CCDC came up with. Which parcels do we think are the cause of this problem? And they went after those parcel owners, UNICAL, VIA, excuse me, Greyhound, Don's Automotive may have been in there, Children's Star Trust. There are various entities that are named in that clean-up and abatement order that they determined, based on historical use of the site, were potential sources for this plume that had been identified through CCDC's investigations. So at the time the clean-up and abatement order was issued, yes, there was preliminary data suggesting that this is where the plume was, based on sampling and monitoring performed prior to the issuance of the clean-up and abatement order. What was the first time it was determined that there was actual contamination that had migrated onto the Ice House parcel property? Well, by VIA themselves in 1990. If you look at ER 872, it happens to be a report prepared by VIA's own consultant, ERC Environmental for Engineering. The report includes a table showing diesel contamination in the wells on the Ice House property. And the sampling date for that was March 30, 1990. Again, well before the March 1, 1992 cutoff date. VIA was already doing work. They already had their own consultant over there sampling. And so you would say that comes under B, if they have addressed such an environmental obligation by way of site assessment, testing, or remediation? Absolutely. Absolutely. So that comes under site assessment and testing? And testing. This is their own consultant in March of 1990 who sampled those wells and has a table in their own report saying here's the data from the wells on the Bosa property, or at that time on the Ice House property. The Court earlier in Appellant's argument made the comment that under this notice provision, it seemed apparent that VIA only had a duty, had to know that they had a duty to clean it up, or had to start cleaning it up in order for that, their indemnity obligation to kick in. In this case, VIA knew back as far as 1987 that they had a problem that was emanating from their site. They knew that they had, from the issuance of the cleanup and abatement orders beginning in 1989, they had all of that. Do you interpret the term obligation? You have to know about the obligation. Does that mean you have to recognize the legal liability or know enough to know that you are obligated under the law, or do you just have to know that there is a problem which may obligate you under the law? I think you have to, according to the definition of the environmental obligation, it allows, it specifically allows for the potentiality of a problem that may arise later through the specific language of migrating hazardous materials. You know, it says that you have to, an environmental obligation is an on-site release of hazardous materials or the migration of that off-site. You know, they submitted a declaration of Ken Reeves who professed 42 years' experience in the environmental industry who also professed that he couldn't possibly have known that this stuff had migrated off of the VIA site, which when you look at the reports prepared by CCDC's consultants early on and VIA's own consultants later on, that type of an argument is ridiculous. For a guy who has done this for 42 years, he knows that this stuff doesn't stop at your boundary. They were on notice the moment they found out they had a leak and they had a contamination problem on their site that that was potentially migrating somewhere else. Now, the fact that they actually went out and did sampling and figured out where it migrated to before 1992 takes the whole imputed knowledge argument out of this. I mean, there's actual knowledge that they knew where it was and how bad it was. I mean, this is a product thickness depth on this table. They know how much diesel fuel is sitting in that well over on Ice House back in 1990. And then to argue that, well, we didn't know that it was a problem, we didn't know that we had a liability to the potential owners of that site. And VIA's own consultant wasn't the only consultant that took measurements of product thickness. Back in 1989, there are maps, and if you look at ER 733, you'll find maps that measure or have measurements of product thickness from 1989, from 1990, from 1991. I mean, it was consistent that people were measuring how much diesel fuel and gasoline was in these various wells in this six-block area, and that all the parties were on notice with respect to that. There came a point in time during the compliance with the cleanup and abatement order that the parties all joined and used one consultant, and that consultant produced reports that mapped the plumes, that showed the depth of product thickness in each well. And, you know, I hate to see how many trees we killed to put this record together, but this is our summary judgment motion. This is hundreds and hundreds of pages of documentation that say VIA, not only did the regulatory body tell you before 1992, not only did GLI tell you before 1992, but you were out there. You guys were out there doing the work before 1992. And now to say, well, we really didn't know about it because OSA didn't file a lawsuit until 1999, I don't think that – I think that's way outside of what was contemplated by the settlement agreement and by the San Diego letter agreement. Thank you, Your Honor. Thank you, Your Honor. Your Honor, a possible contamination of the Ice House is not notice of an environmental obligation. Well, why not? I mean, the whole idea is an indemnification issue, isn't it, if it's contaminated? You say they didn't actually know it was contaminated? I'm saying that the documents describe possible contamination on ER-596, which was referenced by my opposing counsel, which is the letter from the Regional Water Quality Control Board. It mentions a possible source of contamination. The Ice House is not specifically notified – I'm sorry, is not specifically identified as an affected parcel or as a parcel which VAD has to take any remedial action to. So in order to get there, you have to allow the BOSIC claim to be bootstrapped to these prior notices. Environmental obligations is very broadly defined in 2.1. Surely it fits in there somewhere, doesn't it? Well, it's less narrow than the prior agreements between the parties, which allow for any obligation to arise out of or be related to or connected from another. Yeah, but that doesn't help us very much with this language. We have to take this language as it is, don't we not? We have to take the language as it is. Your Honor, may I grab that section? Sure. Our contention is that there would be no requirement and no need to have a notice provision if any type of environmental obligation, whether potential or actual, at any time was going to be the liability of VAD. We would have no need to have a March 10th date. We would have no need to have the settlement agreement. Well, she says the settlement agreement. It goes beyond the San Diego property. Is that right? That's right. But the notice agreement is the notice portion of the agreement does not state that it's limited to. Oh, I understand that. But if I'm drafting a broad agreement and there is one subset of the property subject to the settlement agreement for which there has already been essential compliance with paragraph 2.4, that doesn't sound like it's an implausible construction of an agreement. So you're saying that it had to be, as I understand your reading of this, although the potentiality had been communicated, the actuality, there was no notice of that until 1999 when Joseph felt. So what about counsel's argument that their VAD was actually out sampling and had confirmation with respect to the Ice House property? Your Honor, my response to that is that in recital E of the settlement agreement between BOSA and the defendants, the parties stipulated that there had been no testing, remediation or assessment. That's where is that? Is that the agreement of March 3, 1999? No, Your Honor. That is contained within the agreement between BOSA, the plaintiff and the underlying action, and the defendants on page 499 of the record, where it states, VAD and Greyhound agree that there has been no assessment, testing or remediation of the property by any of the defendants. That would be my response to that argument, Your Honor. Yeah. I meant to ask your comment about that. All right. Did Your Honor have a question, or may I conclude? No, please conclude. Oh, thank you. The settlement agreement between the parties contains much narrower notice requirements. Arising out of, related to or in connection with is not contained within that document, where it is contained within the prior agreements of the parties. In order for this Court to find that VAD was on notice of BOSA's 1999 claim, this Court has to insert impliedly those ten words into the agreement so that BOSA is able to connect or bootstrap his notice to the prior environmental agency orders and the prior correspondences between the parties. That was not the intentions of the parties in drafting this agreement. The intention was for VAD to be able to have a document where it could calculate its reserves and limit its exposures. The arguments by counsel make the entire agreement moot and does not allow the intentions of the parties to be met. Thank you. Thank you, counsel. Ms. Barkow, you don't get any rebuttal, but I did mean to ask you one question. What is your answer to your opposing counsel's statement that there's an agreement between the parties that says they have done no testing, remediation, or exploration, whatever, on the site? I apologize. I meant to address that in my argument, in my statements to the Court. At the time, the agreement she references is a settlement agreement that was entered into with BOSA to resolve the main part of this litigation. The cross-claims continued on. At the time that we entered into that settlement agreement, we relied on the representations of VAD that they had done no testing there. Greyhound, from the outset of this project, VAD has done all of the assessment, remediation testing on the site, and Greyhound has not participated in that because VAD took it upon themselves to do that work under the San Diego Letter Agreement and the preexisting obligations. But the settlement agreement does state that. The settlement agreement does have that stipulation. After we relied on VAD's representation in entering into that, believing that they had done no testing, after we entered into that settlement agreement and we began discovery with VAD, documents were disclosed during discovery that in fact show they had done testing on the BOSA site, and that's the document that I referenced to you, Your Honor. Thank you very much. Thank you. All right. The case just argued will be submitted.
judges: Reinhardt, O'scannlain, Fisher